## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JERRY DALE MEEK,** | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    **Case No. CIV 16-543-RAW-KEW** |
| | ) |
| **JIMMY MARTIN, Warden,** | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

This matter is before the Court on Petitioner's petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 (Dkt. 2). Petitioner is a state prisoner in the custody of the

Oklahoma Department of Corrections who currently is incarcerated at North Fork

Correctional Center in Sayre, Oklahoma. Represented by counsel, he is attacking his

conviction in McCurtain County District Court Case No. CF-2012-311 for First Degree

Murder. He sets forth the following grounds for relief:

    I.     The State's evidence was insufficient to convict Petitioner.

    II.    Trial counsel was ineffective for failing to make a "goodbye note"
         written by the victim part of the record, failing to object to hearsay, and
         failing to object to an evidentiary harpoon.

    III.   The cumulative effect of errors deprived Petitioner of a fundamentally
         fair trial.

(Dkt. 9 at 2-3).

Respondent concedes that Petitioner has exhausted his state court remedies for the

purpose of federal habeas corpus review. The following records have been submitted to the

Court for consideration in this matter:

A.      Petitioner's direct appeal brief.

B.      Petitioner's motion to supplement record on appeal and for evidentiary hearing.

C.      The State's brief in Petitioner's direct appeal.

D.      Petitioner's reply to the State's brief.

E.      Summary Opinion affirming Petitioner's judgment and sentence and denying Petitioner's motion to supplement record and for evidentiary hearing.

F.      Petitioner's petition for rehearing of direct appeal.

G.      Order denying rehearing.

H.      Transcripts of preliminary hearing, motions hearing, jury trial, and sentencing.

I.      Trial exhibits.

I.      Original record.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus

relief is proper only when the state court adjudication of a claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court further explained the AEDPA standard in

*Harrington v. Richter*, 562 U.S. 86 (2011):

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102-03.

**Background**

A review of the record shows that Shelia Walker, who was Hope Meek's mother, testified that she and Ms. Meek talked on the phone daily. (Tr. 225, 229). On the evening of Wednesday, February 20, 2002, Ms. Meek called Ms. Walker, very upset and crying. Ms. Meek told Ms. Walker that Petitioner had pushed her onto a glass-top coffee table, breaking the table and leaving pieces of glass in her back, arm, and buttocks. Ms. Meek also told said she was afraid to move away and take the children, that Petitioner would not allow her to take them, and she would not give up the children. (Tr. 231-33).

Ms. Walker encouraged Ms. Meek to leave with the children and wired $200.00 to

assist her.  Ms. Walker knew Ms. Meek would never leave her children.  Ms. Walker advised Ms. Meek to go to the emergency room for treatment of her injuries.  Ms. Meek agreed to call Ms. Walker the following day, however, this was their final conversation. (Tr. 233-235).

When Ms. Walker did not hear from Ms. Meek the next day, Thursday, February 21, 2002, she began calling Ms. Meek and Petitioner's home.  Ms. Walker called numerous times, however, Petitioner did not return Ms. Walker's calls until Tuesday, February 26, 2002.  Petitioner spoke with Ms. Walker's daughter, Mary Jane, and stated he had not reported to the police that Ms. Meek was missing.  Ms. Meek's family urged him to report Ms. Meek's absence.  Ms. Walker and her family searched for Ms. Meek in Valliant and posted flyers in Valliant and Idabel.  They also created websites in an attempt to locate her. (Tr. 235-38).

When Ms. Meek remained missing for several weeks, Ms. Walker attempted to gain custody of her six-year-old granddaughter, J.K., who was not Petitioner's child.  Although her attempt was unsuccessful, Ms. Walker testified she did receive visitation rights with Ms. Meek's three children, J.K., J.M., and C.M.  (Tr. 238-40).

When J.K. was ten years old, she visited Ms. Walker, her grandmother, and asked about Ms. Meek and whether Ms. Walker knew where Ms. Meek was.  Ms. Walker told J.K. she did not know.  J.K. told Ms. Walker that the last time she saw her mother, Petitioner and her mother were fighting upstairs, and J.K and J.M. were sent to their room.  J.K. also told Ms. Walker that everything then got quiet, and she never saw her mother again. (Tr. 240-42).

Dennis James testified that in 2001, he was an officer with the Valliant, Oklahoma, Police Department. On November 9, 2001, Hope Meek came to the Police Department and reported to Officer James that Petitioner had assaulted her. Ms. Meek told him she was at dinner at Petitioner's house when he received a phone call. Ms. Meek asked him who had called, and he became angry and told her to get out. When she did not leave, Petitioner picked her up and threw her out the door onto the concrete porch. Ms. Meek reported to Officer James that she sustained scratches on her elbows and sore ribs, however, she did not want to pursue charges. (Tr. 259-61).

Ten days later, on November 19, 2001, Officer James was dispatched to Petitioner and Ms. Meek's home regarding a domestic disturbance. When Officer James questioned Ms. Meek, she said she was removing items from a cabinet when Petitioner came over and raked all the cans out of the cabinet. Petitioner also hit Ms. Meek's right ear and kicked her legs out from under her, knocking her to the floor. Ms. Meek then got up and called the police. Petitioner prepared a written statement about what had occurred, and it was admitted into evidence as State's Exhibit 4 (Dkt. 12-12 at 5-7). Again, Ms. Meek did not want to pursue charges. (Tr. 261-66).

Officer James testified he again was dispatched to the Meek residence on February 26, 2002, regarding a missing person. When he arrived, Petitioner had prepared a written statement, and the officer understood Ms. Meek had disappeared. (Tr. 265-67). In the statement, admitted into evidence as State's Exhibit 5 (Dkt. 12-12 at 8-9), Petitioner stated

that Ms. Meek became angry and told Petitioner she was going to leave and start over (Dkt. 268, 273-74).

Petitioner's statement further asserted he got J.K. ready for school and took the two younger children to daycare. Petitioner next got some money from the bank, went to Wal-Mart to get some camping supplies, then returned home and took a nap. He further stated he picked up the children from daycare and drove out of town to take the them camping. After putting up the tent, the children were cold, so Petitioner broke camp and drove around. He drove to Broken Bow, Oklahoma, where he got the children some snacks at Love's. He then drove to Paris, Texas, where he bought lottery tickets before returning home around midnight. (Tr. 273-75). Petitioner told Officer James that Ms. Meek took a couple of bags of clothes but left her truck, her purse, her cell phone, and her keys at their residence. (Tr. 275, 277). Petitioner also said that Hope Meek was five feet two inches tall and weighed 95 pounds, and he was six feet, two inches tall and weighed 170 pounds. (Tr. 278).

At trial, Petitioner's testimony from a January 28, 2003, hearing was read into the record. The hearing occurred as part of a guardianship proceeding where Shelia Walker sought custody of Hope Meek's children. (Tr. 287). At the hearing, Petitioner testified Ms. Meek "just left" in late February 2002. Petitioner denied hitting her. He testified Ms. Meek talked about leaving him for several years. Sometimes Ms. Meek would talk about taking the children, and sometimes she did not say anything about taking them. (Tr. 290-92). Petitioner also testified he bought some large Rubbermaid containers to hold his camping

6

gear and took the children camping at Hochatown. It was cold, so he and the children packed up the camping items and Petitioner drove to Taco Bell in Broken Bow to get the children some food. He next drove to Paris, Texas, and then returned home. (Tr. 295-299).

Petitioner further testified at the hearing that he removed some carpet out of the master bedroom and had it replaced a few days after Ms. Meek went missing. (Tr. 300). Petitioner also stated that Ms. Meek had boyfriends and "got around." (Tr. 302). Petitioner denied having an affair at the time of Ms. Meek's disappearance. (Tr. 303). He admitted that since Ms. Meek disappeared, he had called the OSBI only once to learn of the status of her missing person case. (Tr. 306).

Beverly Abbott testified she worked with Hope Meek at the E-Z Mart. Ms. Meek worked part time at the store, about one or two days per week, and Ms. Abbott was the assistant manager. (Tr. 309-11). Ms. Meek also came in the store as a customer about two or three times per week. One time Ms. Meek asked Ms. Abbott to help her move and rearrange her furniture. Ms. Abbott agreed and went to Hope Meek's house to help her. (Tr. 313). On another occasion, Ms. Abbott was at Ms. Meek's house when Petitioner showed up. Petitioner wanted to know what Ms. Abbott was doing there, and when Ms. Meek became nervous, Ms. Abbott left. When asked if Ms. Abbott had ever seen Ms. Meek without her cell phone or her purse, Ms. Abbott stated she had not.

Ms. Abbott testified she last saw Ms. Meek in February 2002 in the evening when she came in to buy a drink. Ms. Meek was nervous and "just wasn't right," and Ms. Meek asked

Ms. Abbott if she had seen Petitioner talking to someone in a white car. (Tr. 313-17). Ms. Meek was scheduled to work a couple of days after that incident, but Ms. Abbott never saw her again. Ms. Meek did not give notice she was quitting her job at the store, and she did not answer her cell phone after that. (Tr. 316-18).

Around February 26, 2002, Ms. Abbott called Ms. Meek's cell phone and Petitioner answered it. He told Ms. Abbott that she was not there, and he had not talked to her or seen her. (Tr. 318). Ms. Abbott testified Ms. Meek would not have left her children voluntarily. (Tr. 319).

Helen Lowrance testified she worked for the Department of Human Services, and on February 19, 2002, she worked in the food stamp, medical, and daycare eligibility division. Ms. Meek was one of her clients, although Ms. Lowrance never had met her. On February 19, 2002, Ms. Lowrance received a call from a woman who identified herself as Hope Meek. The woman told Ms. Lowrance she wanted to close her cases because "she was getting back with her husband." Ms. Lowrance closed out Ms. Meek's medical and daycare cases. (Tr. 331-33).

Antoinette Ricks testified that in the fall of 2001, she worked as the bookstore manager at the E.T. Dunlap Center at Southeastern College in Idabel. She met Hope Meek when Ms. Meek was buying some books. Ms. Ricks testified she and Ms. Meek "just clicked," and Ms. Meek would come into the bookstore more than once a week to visit with Ms. Ricks. Ms. Meek frequently would have her two youngest children with her. Sometimes

Ms. Meek would have a babysitter for the children, but there were some occasions when Ms. Ricks would watch the children in the bookstore while Ms. Meek attended class. (Tr. 352-55). Ms. Meek and Ms. Ricks became friends, and Ms. Ricks helped Ms. Meek get a job with the sheriff's department as a dispatcher. (Tr. 356-57, 360).

Ms. Ricks saw bruises on Ms. Meek's leg, neck, and chest area. Ms. Meek called Ms. Ricks the day before Ms. Meek went missing, but Ms. Ricks missed the call. (Tr. 364). Ms. Ricks never saw Ms. Meek without her cell phone. (Tr. 358). Ms. Ricks testified that Ms. Meek loved her children and had a very close relationship with them. (Tr. 357). Based upon her friendship with Ms. Meek, Ms. Ricks did not believe Ms. Meek would ever leave her children. (Tr. 365).

Gerald McDaniel testified he knew Hope Meek through his cousin, Rocky Dunithan. The two men lived together with McDaniel's grandmother, and Mr. Dunithan and Ms. Meek were good friends. On February 20, 2002, Ms. Meek called their residence, wanting to speak with Mr. Dunithan. Mr. McDaniel told Ms. Meek that Mr. Dunithan was not home. Later, Ms. Meek came to the house looking for Mr. Dunithan. Mr. Dunithan was not at home, but Ms. Meek and Mr. McDaniel had a conversation. During the conversation, Ms. Meek told Mr. McDaniel that Petitioner threw her on the ground and "they dug glass out of the back of her neck and her arm." Mr. McDaniel testified he observed a scratch on one of Ms. Meek's arms and on the back of her neck. (Tr. 374-78).

Penny Howell testified that her husband, Kelly Howell, and Petitioner worked

together at Weyerhauser.  On February 9, 2002, around 10:00 p.m., Petitioner came to the Howell residence with his four-wheeler and wanted to ride with Mr. Howell.  Petitioner was angry and told Ms Howell that he and Ms. Meek were fighting.  (Tr. 388-91).

Ms. Howell further testified that on February 19, 2002, she received a phone call from Ms. Meek who said Mr. Howell was having an affair with Ms. Meek's friend, Tonya Nations.  In return, Ms. Howell told Ms. Meek that Petitioner was having an affair with his co-worker named Marguerite.  During the conversation, Ms. Meek told Ms. Howell that Petitioner had pushed, shoved, and choked her.  Ms. Meek specifically told Ms. Howell of two incidents when these acts occurred.  In one, Petitioner choked Ms. Meek on the couch, stopping only when her little boy came in the room.  In another incident, her little girl would not stop crying, and Petitioner came into the kitchen, choked Ms. Meek, and pinned her against the refrigerator.  Ms. Meek told Ms. Howell she loved Petitioner and did not want a divorce.  Ms. Meek also said she was taking classes, however, Petitioner did not like it.  Ms. Meek stated she planned to confront Petitioner about his affair but was not going to leave him.  (Tr. 399-06).

The next night, Petitioner called Ms. Howell.  In a very angry tone, he told her to mind her own business and not to tell Ms. Meek anything or give her any advice if she knew what was good for her.  Ms. Howell testified she did not tell police about these occurrences at the time of Ms. Meek's disappearance, because Mr. Howell told her to stay out of it.  After Ms. Meek disappeared, Ms. Howell observed flyers posted around town regarding her

disappearance. One day, Ms. Howell pulled into Gary's Mini-Mart after taking her husband to work, and she saw Petitioner removing a flyer from a pole in front of the Mini-Mart. (Tr. 407-09).

Kelly Howell, Penny Howell's ex-husband, testified that on February 20, 2002, the day before Ms. Meek's disappearance, Petitioner told him to "keep [his] bitch on a short leash." According to Mr. Howell, this was in reference to Ms. Howell's conversation with Hope Meek the day before. (Tr. 432, 438-39).

Tonya Schooley testified she knew Hope Meek because Ms. Meek was a neighbor of Ms. Schooley's ex-husband, Richard Mortenson. Mr. Mortenson was Ms. Meek's neighbor when Ms. Meek was separated from Petitioner, and she lived in a rent house next to Mr. Mortenson. On February 20, 2002, the day before her disappearance, Ms. Meek called Ms. Schooley and wanted Ms. Schooley to bring her some Excedrin. Ms. Schooley took the Excedrin to Ms. Meek at the Meeks' marital residence. Ms. Schooley testified Ms. Meek had moved back into this residence about two weeks prior to this date. Ms. Meek was moving slowly when she came out to get the medicine, saying she and Petitioner had gotten into a fight. Ms. Schooley saw a bruise on Ms. Meek's neck, one on her arm and one "close to the back of her spine." Ms. Meek told Ms. Schooley she had questioned Petitioner about an affair with a woman named Marguerite. Ms. Schooley never heard from Hope Meek again after this encounter. Ms. Schooley further testified that Ms. Meek was a "very good mother" and would not have left her children. (Tr. 426).

J.K. testified she lived with Petitioner and Tiffany Oney and that Petitioner was her legal guardian. J.K. considered Ms. Oney to be her legal guardian also, but Ms. Oney and Petitioner were not legally married. J.K. further testified her real mother's name was Hope. J.K. did not remember the last time she saw her mother, and she did not remember her mother being in the house when she was six or when she was in kindergarten. (Tr. 448-52). In fact, she could not remember anything about her mother or ever talking with anyone about anything having to do with her mother and Petitioner. (Tr. 453-63).

Vicki Bell testified she was employed by the Department of Human Services for ten years, commencing in 1996. On February 28, 2002, she conducted investigations into alleged abuse and neglect cases. Her investigations included interviews with children to determine the validity of the reports made in those cases. In February 2002, she was asked by the OSBI to interview J.K. and J.M. regarding the disappearance of their mother, Hope Meek. J.K. was almost seven years old, and J.M. was too young to be interviewed. (470-74, 502).

Ms. Bell further testified that J.K. understood the questions and answered them appropriately. J.K. told Ms. Bell that she heard her mother tell her friends that Petitioner hit her with glass. J.K. pointed to her left shoulder and to the back of her neck and explained to Ms. Bell that was how her mother described being hit with the glass. (Tr. 477-78).

J.K. told Ms. Bell that she, her brother, and her father lived in their home, and Petitioner had told J.K. that her mother was with friends. J.K. also told Ms. Bell the last time she saw her mother was in her mother and Petitioner's bedroom, and her mother and

12

Petitioner were fighting. J.K. asked if she and her brother could go downstairs, and when her mother gave permission, J.K. and her brother went downstairs to watch television. She heard a fight between her mother and Petitioner, and she heard the "F-word." The fight ended when her mother got quiet. J.K. described another occasion where her mother had been in the car and Petitioner kicked her mother, and she also described an incident when Petitioner hit her mother and the police were called. (Tr. 479-80).

J.K. told Ms. Bell that after the fight, she and her brother helped Petitioner cut out a section of carpet, roll it up, and place it in the trunk of their red car. They dumped the carpet at a dump she thought was close to Hochatown. J.K. said they went fishing, fed the ducks, and went camping. Then, they went to her grandparents' house and finally returned home. (Tr. 481). J.K. said she had not talked to her mother since that time, and Petitioner had told J.K. her mother was gone forever. (Tr. 480-82).

OSBI Agent Cliff Fielding testified he was assigned to assist in the investigation into the disappearance of Hope Meek. Agent Fielding testified that on February 28, 2002, he interviewed Petitioner and executed a search warrant for the Meek residence. (Tr. 540-41). Ms. Meek's cell phone was recovered from a counter of the residence, and her keys were found inside the stove in the pull-out broiler drawer. During the interview with Petitioner, he told Agent Fielding he found the keys on the kitchen counter when he got home. (Tr. 544-547).

Agent Fielding further testified Petitioner gave a statement to Officer Dennis James

on February 26, 2002, two days prior to the Fielding's interview with Petitioner. Petitioner's written statement to Officer James differed in several respects from what he told Agent Fielding. For example, in his statement, Petitioner indicated he went to Wal-Mart and bought camping supplies on the afternoon of February 21, 2002. (States Exhibit 5, Dkt. 12-12 at 8-9). In his interview, however, Petitioner told Agent Fielding he went to Wal-Mart to buy camping supplies and plastic containers. (Tr. 552). The surveillance tape from Wal-Mart of Petitioner's trip there and the receipt for his purchase showed that he had purchased only two large, fifty gallon plastic totes and nothing else. (Tr. 559; State's Exhibits 52-53, Dkt. 12-12 at 54-55).

During the interview, Petitioner told the agent that on February 20, 2002, he and Ms. Meek had an argument because Ms. Meek believed Petitioner was having an affair with his coworker, Marguerite Hart. Ms. Meek and Petitioner "scuffled" over the keys to Petitioner's red truck, but Petitioner got the keys. Inside the house, Petitioner and Ms. Meek continued the argument, with Ms. Meek striking Petitioner in the back and Petitioner pushing Ms. Meek down between the coffee table and some pillars in the family room. The two older children, J.K. and J.M. were at the house. Around 2:30 p.m., Petitioner left the house to go to work. (Tr. 549-50).

At Petitioner's workplace, his supervisor, Joe Williams, told Petitioner that Ms. Meek had called Mr. Williams and asked him to put Petitioner on a different shift, so he would not work the same shift as Marguerite Hart. Mr. Williams and Petitioner walked out to the

parking lot where Petitioner saw Ms. Meek and all the children in Ms. Meek's truck. Petitioner and Ms. Meek began arguing, and Petitioner told her he would not argue with her there. They drove to Valliant City Park to talk. Agent Fielding testified all this information was not contained in the statement Petitioner made two days prior to the interview. (Tr. 550).

Petitioner told Agent Fielding that on February 21, 2002, he returned home from work after his shift ended at 7:00 a.m. Ms. Meek told him to get J.K. ready for school, which he did. Ms. Meek sent J.K. to school and then she left the house in her truck. Ms. Meek returned home around 8:00 a.m. and went to sleep. She was angry and threatened to leave. Petitioner got the two younger children up and took them to daycare. Petitioner then went to the bank and cashed a check for $1,000.00, drove to the Wal-Mart in Hugo, Oklahoma, bought camping items, and returned home. (Tr. 551-52).

Ms. Meek was at home but Petitioner did not talk to her. He took a nap for about two hours. Petitioner then got up, left $500.00 in cash on the counter next to Ms. Meek's cell phone and truck keys, and loaded the camping equipment into his truck. He called in to his work and reported he would not be working that night. Petitioner picked up the children around 4:00 p.m. and drove to Hochatown. When it was almost dark, Petitioner found a campsite near Hochatown Cemetery and set up a tent. The children played for about an hour, but it was cold and Petitioner decided it was time to leave. He drove to Broken Bow where he stopped at a Love's and bought some snacks. Petitioner next drove to Paris, Texas and bought a lottery ticket, then he drove back to Valliant. When Petitioner arrived back at his

residence around midnight, Ms. Meek's truck was there, and inside the house he saw her truck keys and cell phone on the counter. The $500.00 was gone. He looked for Ms. Meek in the house but did not find her, and she had not left a note anywhere in the house. Petitioner did not know if Ms. Meek's purse or any of her clothes were missing. He told the agent he never heard from Ms. Meek again. (Tr. 552-54).

Petitioner told Agent Fielding that on February 26, 2002, he made a missing person report to Valliant Police Department regarding Ms. Meek's disappearance, after Ms. Meek's family told him he needed to do so. Officer Dennis James took the report. Petitioner told Agent Fielding that he believed Ms. Meek had a boyfriend who was a crack dealer, she was shacked up with someone, and she had threatened to kill herself. This information was not contained in the report Petitioner gave to Officer Dennis James. (Tr. 555). Agent Fielding testified the two plastic totes Petitioner purchased were not found during the search of Petitioner's house. (Tr. 559).

Elmer Roberts testified on February 27, 2002, he owned a carpet store in Idabel. (Tr. 578-79). At closing time on that date, Petitioner came into his store and wanted some carpet laid "pretty quick." Mr. Roberts went to Petitioner's home that evening and measured the upstairs area. (Tr. 581-82). When Mr. Roberts went into the master bedroom, he observed a rectangular piece of carpet had been removed from the room, but the pad was still there. (Tr. 588-89). The new carpet was installed in Petitioner's house the next morning. (Tr. 583; 610-11). Gary Hamilton, who installed the carpet, testified the pad as well as a large piece

of carpet were missing from the master bedroom when he arrived at Petitioner's house on the morning of February 28, 2002. The area of missing carpet was approximately nine square yards. (Tr. 614).

OSBI Special Agent Chad Dansby testified he became the case agent in Hope Meek's disappearance case in 2010. Agent Dansby prepared a timeline of events concerning the investigation into Ms. Meek's disappearance, which was admitted into evidence as State's Exhibits 65-A, B and C. Agent Dansby also testified concerning the many steps he took in attempting to locate Ms. Meek and that he never found her. (Tr. 662-701).

Petitioner testified in his own defense. He told the jury he met Hope after he got out of the Air Force, while she was getting a divorce from her first husband. He said his main purpose in having Hope come to Oklahoma with him in 1997 was that he needed her to drive one of his cars from New Mexico. Petitioner had no plans to marry Ms. Meek, even though he was living with her and engaging in a sexual relationship with her. Petitioner testified, "[S]he ended up getting pregnant." She did not want another baby or even another relationship, according to Petitioner. Ms. Meek wanted an abortion, but Petitioner did not want her to have one. He testified they reached an agreement that Ms. Meek would have the baby, and if she wanted to move on, she would. Petitioner and Ms. Meek were married on December 1, 1997, and J.M. was born December 18, 1997. (Tr. 996-1001).

Petitioner further testified he and Ms. Meek had good and bad times. Their relationship was like a roller coaster, and Petitioner filed for divorce in 1999. He did not like

17

the way Ms. Meek dealt with J.M., however, because Ms. Meek told him he could not get custody of J.M., they reunited. Petitioner and Ms. Meek bought a house in Valliant in July 2000, and she became pregnant again. Petitioner testified Ms. Meek wanted an abortion, and she previously had had an abortion without her first husband's knowledge. C.M. was born in March 2001. (Tr. 1002-05, 1008).

Petitioner's testimony can best be summarized as a collection of complaints about Ms. Meek and a recitation of incidents that showed her bad character. For example, she wanted not one, but two abortions, she put the children in daycare without his knowledge, she stayed out all night and came home in the early hours of the morning, she brought her boyfriend into the home, she made "1-900" phone calls, she had parties while he was at work, and so forth. (Tr. 1000, 1005, 1009-12).

In the fall of 2001, Ms. Meek moved out of their house and into a rent house with the children. He claimed Ms. Meek put the children in daycare to get rid of them. (Tr. 1012-15). During his separation from her, if he was not working, he had the children. (Tr. 1018). Petitioner denied ever abusing Ms. Meek. (Tr. 1022, 1025).

When Ms. Meek wanted to return to the marital home in December 2001, Petitioner testified he did not want her to, but he was afraid of getting a divorce. He was afraid Ms. Meek would take the children and move away. J.K. was a daddy's girl, and Petitioner knew he would have no chance at custody of her, because he was not her biological father. (Tr. 1027-238). Ms. Meek moved back into the marital home around the end of January or the

first of February of 2002.  (Tr. 1030).

Petitioner testified that Ms. Meek kept staying out late at night and being dissatisfied with taking care of the children.  (Tr. 1031-32).  Ultimately, Petitioner testified in accordance with what he told Agent Fielding in his interview, denying he ever physically assaulted Ms. Meek and insisting she left and he never heard from her again.  (Tr. 1046-99).

**Ground I:  Sufficiency of the Evidence**

Petitioner alleges in Ground I of the petition that the trial evidence failed to show beyond a reasonable that he committed murder.  The Oklahoma Court of Criminal Appeals (OCCA) denied relief on this claim as follows:

> After thorough consideration of Meek's propositions of error and the entire record before us on appeal, including the original record, transcripts, exhibits and briefs, we have determined that the judgment and sentence of the district court shall be affirmed.
>
> In reaching our decision, we find . . . that, in reviewing sufficiency claims, this Court examines the evidence in a light most favorable to the State and determines whether there was sufficient evidence for any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. *Easlick v. State*, 90 P.3d 556 (Okla. Crim. App. 2004); *Spuehler v. State*, 709 P.2d 202 (Okla. Crim. App. 1985).  This Court reviews "the direct and circumstantial evidence, crediting all inferences that could have been drawn in the State's favor, to determine if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *Davis v. State*, 103 P.3d 70 (Okla. Crim. App. 2004).  In a light most favorable to the State, we find that any rational trier of fact could have found the essential elements of first degree malice murder beyond a reasonable doubt. *See Arnold v. State*, 803 P.2d 1145, 1148 (Okla. Crim. App. 1990).

*Meek v. State*, No. F 2014-34, slip op. at 2 (Okla. Crim. App. Aug. 27, 2015) (unpublished).[1]

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th

---

[1] Parallel citations in the Oklahoma Court of Criminal Appeals' opinion have been omitted throughout this Opinion and Order.

Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

The OCCA applies the principles of *Jackson* when a defendant challenges the sufficiency of the evidence. In *Spuehler v. State*, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985), which is cited the opinion affirming Petitioner's judgment and sentence, the OCCA adopted the Supreme Court's holding in *Jackson* as the standard in Oklahoma to evaluate claims of insufficient evidence.

"The Court may not weigh conflicting evidence nor consider the credibility of witnesses. Rather, the Court must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'" *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993)). Both direct and circumstantial evidence are considered in determining whether sufficient evidence supports a conviction. *Lucero v. Kirby*, 133 F.3d 1299, 1312 (10th Cir. 1998) (citing *United States v. Swallow*, 511 F.2d 514, 520 (10th Cir. 1975)). Even where facts supporting conflicting inferences are presented, the court must presume the jury resolved any conflicts in favor of the prosecution and must defer to that resolution. *Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004).

Consistent with *Lucero*, the OCCA also holds that circumstantial evidence can provide proof of an element of a crime. *Cf. Hamby v. State*, 720 P.2d 345, 346 (Okla. Crim. App. 1986) (where victim testified she saw the defendant naked in doorway moving his hand

21

around on his genitals, but did not see his genitals, circumstantial evidence showed that a reasonable person could properly infer that the defendant exposed his private parts in a public place, and the defendant's conviction was properly supported by sufficient evidence). Under Oklahoma law, "a body need not be found in order for the crime of murder to be proven." *Arnold v. State*, 803 P.2d 1145, 1148 (Okla. Crim. App. 1990) (citing *Rawlings v. State*, 740 P.2d 153 (Okla. Crim. App. 1987)). "Circumstantial evidence may be used to prove the *corpus delecti*." *Id.* In addition, "[m]alice aforethought may be proved by circumstantial evidence." *Davis v. State*, 268 P.3d 86, 111 (Okla. Crim. App. 2011) (citing *Bland v. State*, 4 P.3d 702, 713-14 (Okla. Crim. App. 2000)). In *Rutan v. State*, 202 P.3d 839 (Okla. Crim. App. 2009), another case where the victim's body never was found, the OCCA found "evidence of the history of verbal and physical abuse inflicted upon the victim by Appellant supports a finding that she used unreasonable force on [the victim] which resulted in his death." *Id.*, 202 P.3d at 850.

The State was required to prove beyond a reasonable doubt the following elements of the crime of First Degree Murder: (1) the death of a human, (2) the death was unlawful, (3) the death was caused by Petitioner, and (4) the death was caused with malice aforethought. (Instruction No. 4-61; OUJI-CR (2d) (Dkt. 12-13 at 227)). Petitioner contends the State failed to prove all these elements because Hope Meek's body never was found.

As set forth by the State in its brief on direct appeal, there was ample evidence presented from which the jury could find beyond a reasonable doubt that Petitioner

committed first degree murder in the death of Hope Meek. The evidence showed Ms. Meek attempted to reconcile with Petitioner, and she was upset with him because she believed he was having an affair with his co-worker. (Tr. 404-06, 422, 1027-30). The evidence also showed Petitioner was violent with Ms. Meek. (Tr. 260-64, 364, 423-24, 479-80). Under *Rutan*, this was circumstantial evidence of Petitioner's use of violence against Ms. Meek which resulted in her death. The evidence further showed Ms. Meek was a caring mother who never would have left her children, and it showed she never would have failed to communicate with her mother regarding her whereabouts. (Tr. 233-34, 319, 365, 425).

Petitioner testified that Ms. Meek moved out of the marital home in August or September of 2001, however, in December 2001 she wanted to return to the marital home. (Tr. 1017-18). In January 2002, he told Ms. Meek that she could not move back into their home, because she "still was [running] around and whoring and stuff." (Tr. 1029). He did not want to reconcile with her, but he was afraid to divorce her because he knew he could not gain custody of J.K., and he feared he would lose custody of his biological children. (Tr. 1028). She moved back in to the marital home in January or February of 2002. (Tr. 1029-30).

Petitioner never testified or told anyone that he loved Hope Meek or that he had ever loved her. He also never testified or told anyone he or the children missed her. Instead, his testimony demonstrated that Hope Meek was a burden to him, and he felt trapped and taken advantage of by Ms. Meek. This situation with his wife, coupled with her agitation at him

over his alleged affair with a coworker provided the circumstantial evidence of Petitioner's intent to kill Ms. Meek as contemplated by *Davis*, 268 P.3d at 111. Further, Petitioner admitted he had had the use and possession of all of his and Ms. Meek's property since she disappeared. (Tr. 1143). *Cf. Bland v. State*, 4 P.3d 702, 714 (Okla. Crim. App. 2000) (evidence presented at trial showed the appellant was unhappy with the victim because he felt he was stuck doing the victim's work, and the appellant had possession of the victim's property after the victim was killed. This evidence, along with other evidence presented at trial, provided circumstantial evidence of the appellant's malice aforethought in killing the victim).

The record shows that J.K. heard her parents fighting and never saw her mother again. (Tr. 479-81). Petitioner took J.K., aged six; J.M., aged three; and C.M., less than one year old, on a camping trip on the night Hope Meek disappeared. (Tr. 553). The surveillance tape from Wal-Mart of Petitioner's trip there and the receipt for his purchase at the store showed he bought the two large, 50-gallon plastic totes and nothing else, despite his claim that he also bought camping supplies. (Tr. 559). Petitioner removed carpet from the master bedroom of his and Ms. Meek's home the day of her disappearance. (Tr. 480-81), and within one week he had new carpet installed. (Tr. 580-83, 610-18). The two plastic totes Petitioner purchased were not found during the search of his house. (Tr. 559).

Agent Dansby's timeline, based upon the evidence presented, demonstrated the logical sequence of events which culminated in Ms. Meek's death at the hands of Petitioner. (Tr.

658-701). All of this circumstantial evidence proved Ms. Meek was dead, despite the fact that her body never was found. After careful review of the record, the Court finds the evidence was sufficient under the standard of *Jackson v. Virginia*. The Court, therefore, finds the OCCA's determination that the evidence was sufficient did not constitute an unreasonable application of the *Jackson* standard. The Court further finds Petitioner has failed to show "there was no reasonable basis for the state court to deny relief" as required by *Richter*. This ground for habeas corpus relief fails.

**Grounds II: Ineffective Assistance of Trial Counsel**

Petitioner alleges his trial counsel was ineffective in (1) failing to make the so-called "goodbye note" allegedly written by Hope Meek a part of the record, (2) failing to object to hearsay testimony, and (3) failing to object to an alleged evidentiary harpoon. Petitioner raised this claim on direct appeal, and the OCCA denied relief as follows:

> We find . . . Meek has not shown that counsel's conduct fell below the wide range of reasonable professional conduct, or that the result of the proceeding would have been different had counsel performed as he now, in hindsight, would have preferred. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Meek suffered no prejudice in counsel's failure with regard to [the goodbye note] . . . . Counsel's failure to object to much of the hearsay evidence . . . was likely due to a type of trial strategy showing that the victim tried to blame Meek for their troubled marriage and finally left; therefore, counsel's conduct did not constitute ineffective assistance. Lastly, Meek suffered no prejudice in the failure of counsel to preserve issues [regarding sufficiency of the evidence and the alleged evidentiary harpoon], as no error occurred.

*Meek*, slip op. at 5 (Dkt. 11-5).

As stated by the OCCA, the proper standard for analyzing a claim of ineffective

25

assistance of counsel is set forth in *Strickland v. Washington*. In *Strickland*, the Supreme Court set forth the two-part test for determining the validity of an ineffective assistance of counsel claim: (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Id.*, 466 at 687.

"[W]hile in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111 (internal citations and quotation marks omitted). Regarding the prejudice prong of *Strickland*, the *Richter* Court held:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Id.*, 562 at 111-12 (internal citations and quotation marks omitted).

Under AEDPA, a "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. When evaluating the state court's resolution of *Strickland*'s performance requirement, federal courts must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571

26

U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189-90 (2011)). "The question 'is not whether a federal court believes the state court's determination' under *Strickland* 'was incorrect but whether [it] was unreasonable--a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Shiro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## A.    The "Goodbye" Note

This claim formed the basis of Petitioner's motion to supplement the record on direct appeal pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, tit. 22, Ch. 18, App. (2006). Respondent contends the circumstances regarding production of this note were "incredible." The unsigned, undated, handwritten note read as follows:

Jerry,

Through it all I have always been the one trying to hold this family together. You need to grow up & live your own life instead of your Mommy telling you what to do. You all are finally getting what you have been wanting so this is my way of saying good-bye. I will <u>always</u> love you but I have been pushed till I can't take it no more.

I love you.

(Dkt. 11-2 at 5) (emphasis in original).

The record shows that defense counsel did not advise the State of the note's existence until well into the defense's case, when its admission into evidence was sought. (Tr. 975-76). Defense counsel told the trial court that the note had been in his files for at least two months before trial, but he maintained it had not been copied with all the materials the

27

defense provided to the State in discovery. (Tr. 976). Defense counsel further informed the trial court that Petitioner discovered the note in his lunch box after his interviews with the police, and it had been in Petitioner's possession since 2002. (Tr. 978, 980).

The State objected to the note's admission, because it was not disclosed in discovery, and its existence had never been mentioned in the history of the case. The State also pointed out for the trial court that: (1) Petitioner made five statements regarding Ms. Meek's disappearance and never mentioned the note once; (2) Petitioner's house was searched on February 28, 2002, and the note was not discovered; (3) Petitioner was interviewed by Agent Fielding and never mentioned the note; and (4) Petitioner gave sworn testimony in another proceeding in 2003 regarding Ms. Meek's disappearance and never mentioned the note. (Tr. 979-80).

Based upon this record, the trial court ruled as follows regarding the admission of the note:

> The Court makes the following findings: The Defendant through counsel's own statement says that the document is extremely important. The Court finds that any delay in discovery is prejudicial to the State because of the importance that the Defendant puts on this. The Court further finds that subsequent to the disappearance of Mrs. Meek there was a search of the defendant's premises pursuant to a search warrant. This letter was not discovered. The Court further finds that it was never mentioned until Saturday or Sunday, one to two days after the State has rested. No; two to two and a half days after the State had rested; two days after the Defendant had given an opening statement. There was no mention of the letter in Defendant's opening statement and the prior testimony of the defendant and any statements given by the defendant there was no mention of this letter. The letter is not dated. It is not signed.

The Court further finds there is no opportunity to test the authenticity. The Court further finds that it is incredible that a document that the Defense says is extremely important remains secret for eleven plus years until Sunday, three days after the State rests. I further find that the delay is meant to obtain a tactical delay in discovery; it is meant to obtain a tactical advantage and the explanation of the delay is incredible and find that it is not accidental. Therefore, the document will not be allowed and the motion in limine is granted. The Defendant will not mention the document.

(Tr. 982-83).

A defendant has the right to present a defense, but he must comply with rules of procedure and evidence which are designed to assure fairness and reliability in criminal proceedings. *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986). *See also Simpson v. State*, 230 P.3d 888, 895 (Okla. Crim. App. 2010). The right to present a complete defense is recognized in Oklahoma, but there are some limitations. *Summers v. State*, 231 P.3d 125, 151-52 (Okla. Crim. App. 2010).

In *Nevada v. Jackson*, 569 U.S. 505 (2013), the trial court ruled the defendant could not present evidence of the victim's prior rape allegations against him, because the defendant failed to provide the required written notice to the prosecution that he intended to present this evidence, as required by Nevada law. On habeas review, the Ninth Circuit Court of Appeals held this ruling violated the defendant's right to present a defense. The Supreme Court, however, reversed the Ninth Circuit, holding the notice requirement was not unconstitutional. *Id.*, 569 at 509-10.

In line with the reasoning of *Jackson*, the OCCA holds that when the defense willfully fails to disclose evidence in order to gain a tactical advantage, the trial court does not abuse

its discretion by precluding introduction of the evidence at trial.  In such a case, the exclusion does not deny the defendant a meaningful opportunity to present a complete defense.  *Lozano v. State*, 313 P.3d 272, 273-74 (Okla. Crim. App. 2013).

Based upon the above record, the OCCA found the issue regarding the note's admission was waived, because defense counsel failed to make an offer of proof regarding the note's contents.  Because Petitioner used this issue as the basis for one of his ineffective assistance of counsel claims, as well as his Rule 3.11 motion, the OCCA addressed the ineffective assistance of counsel issue, denying relief as follows:

> . . . [W]e find that defense counsel waived the issue by failing to make an offer of proof regarding the contents of the note sought to be offered.  *See* Okla. Stat. tit. 12, § 2104.  Meek seeks to overcome this failure by raising a related ineffective assistance of counsel claim and by filing a motion for an evidentiary hearing and for supplementation of the record pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2015).  We have reviewed the ineffective assistance claim along with the motion and find that Meek suffered no prejudice in the failure of counsel's attempt to introduce the evidence.  He cannot, therefore, meet the prejudice prong of a *Strickland* analysis.  Likewise, the motion for evidentiary hearing and for supplementation of the record is denied.

*Meek*, slip op. at 2-3 (footnote omitted).

In *Richter*, the Supreme Court held the question to be asked on habeas review regarding counsel's representation is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id*. 562 U.S. at 105.  As set forth above, Petitioner testified about Ms. Meek's shortcomings and her dissatisfaction with her life with him.  He also gave his version of her disappearance.  Therefore, his defense was presented

to the jury. The provenance of the note was very questionable, as shown by the trial court's statements finding its appearance more than eleven years after Ms. Meek's disappearance to be "incredible." (Tr. 983). Finally, the evidence against Petitioner was significant.

After careful review of the record, this Court finds the OCCA's decision that trial counsel was not ineffective in failing to make an offer of proof regarding the note is not contrary to, or an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the evidence presented at trial. Therefore, this ground for habeas relief fails.

### B. Hearsay Evidence

Petitioner alleges his counsel was ineffective for failing to object to testimony of numerous witnesses regarding statements Ms. Meek made to them. He argues the following testimony was improperly admitted: Shelia Walker's statements recounting that Ms. Meek told Ms. Walker that Petitioner had beaten her; Ms. Walker's statements about what J.K. told Ms. Walker regarding the last time J.K. saw Ms. Meek; Officer James' testimony about what Hope Meek said concerning Petitioner's abuse of her; Beverly Abbott's testimony about a conversation she had with Ms. Meek shortly before Ms. Meek's disappearance; Penny Howell's testimony about a phone conversation she had with Ms. Meek in which Ms. Meek told Ms. Howell about Mr. Howell's affair; Gerald McDaniel's testimony about what Ms. Meek said concerning Petitioner's abuse of Ms. Meek; Tonya Schooley's testimony about what Ms. Meek told her concerning Petitioner's abuse of Ms. Meek; and Vicki Bell's

testimony about what J.K. told her concerning the last time J.K. saw Ms. Meek and a fight between Petitioner and Ms. Meek.

Petitioner alleged on direct appeal that this testimony was improperly admitted in violation of the Oklahoma statutory prohibition against the admission of hearsay and in violation of the Confrontation Clause. He claimed his trial counsel was ineffective with respect to the hearsay, and he also presented the underlying substantive claim. The OCCA denied relief as follows:

> . . . [W]e find that statements introduced, which were made by Hope Meek prior to her disappearance were not met with contemporaneous objections, thus error is waived, except that this Court may review for plain error. Okla. Stat. tit. 12, § 2104. Plain errors are those errors which are obvious in the record, and which affect the substantial rights of the defendant; that is to say that the error affects the outcome of the proceeding; moreover, this Court will not grant relief for plain error unless the error seriously affected the fairness, integrity or public reputation of the judicial proceeding or otherwise represents a "miscarriage of justice." *Hogan v. State*, 139 P.3d. 907, 923 (Okla. Crim. App. 2006); *Simpson v. State*, 876 P.2d 690, 700-01 (Okla. Crim. App. 1994). Here, no plain error occurred, as the statements, in context, were utilized to show the state-of-mind and to provide motive for the killing. *Washington v. State*, 989 P.2d 960, 973 (Okla. Crim. App. 1999).

> Appellant also makes reference to out-of-court statements made by witness J.K. Some were met with objection others were not. The introduction of witness J.K.'s out-of-court statements did not violate the confrontation clause of either the United States or Oklahoma Constitutions as J.K. appeared at trial and was subject to cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68, n.9 (2004); *United States v. Owens*, 484 U.S. 554, 580 (1988); *California v. Green*, 399 U.S. 149 (1970); *Mitchell v. State*, 120 P.3d 1196, 1207 (Okla. Crim. App. 2005). We further find that the trial court did not abuse its discretion in allowing J.K.'s statements under Oklahoma's rules of evidence, as the statements complied with Okla. Stat. tit. 12 § 2804.1 (2011). No error occurred in the introduction of J.K.'s statements.

*Meek*, slip op. at 3-4. When the OCCA adjudicates a claim pursuant to its plain error review, it has addressed any due process argument regarding that claim, because the OCCA's plain error test is the same one utilized by the Tenth Circuit in determining a due process violation. *Thornburg v. Mullin*, 422 F.3d 1113, 1124-25 (10th Cir. 2005).

The Sixth Amendment as made applicable to the states through the Fourteenth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI, XIV. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court thoroughly examined the historical meaning of the Sixth Amendment's Confrontation Clause and determined that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id*., 541 U.S. at 59. The Supreme Court's holding, however, is limited to testimonial statements:

> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused--in other words, those who "bear testimony." 2 N. Webster, *An American Dictionary of the English Language* (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid*. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Id*. 541 U.S. at 51.

"The Confrontation Clause bars the introduction of testimonial hearsay against a criminal defendant, unless the declarant is unavailable and the accused has had a prior

opportunity to cross-examine the declarant." *Smith v. Sirmons*, 200 F. App'x 822, 825 (10th Cir. 2006) (citing *Crawford*, 541 U.S. at 53-54). Testimonial hearsay includes "*ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, . . . extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52 (citations and internal quotation marks omitted). The admission of non-testimonial hearsay does not implicate the Confrontation Clause. *Id.* at 68. *See also United States v. Faulkner*, 439 F.3d 1221, 1226 (10th Cir. 2006 ) ("[T]he Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted").

The OCCA determined the statements made by the victim were statements relevant to her state of mind--a firmly established exception to the inadmissibility of hearsay. *See Moore v. Reynolds*, 153 F.3d 1086, 1107 (10th Cir. 1998) (holding hearsay statements were properly admitted under the "state of mind" exception because the exception is a "firmly rooted hearsay exception."). In Oklahoma, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Okla. Stat. tit. 12, § 2801(3). Non-testimonial hearsay may be

admitted against a defendant "if the hearsay is inherently trustworthy and reliable," and reliability can be inferred "where the evidence falls within a firmly rooted hearsay exception." *Miller v. State*, 98 P.3d 738, 744 (Okla. Crim. App. 2004). Pursuant to Okla. Stat. tit. 12, § 2803(3), "[a] statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health" is not excluded by the hearsay rule, regardless of the declarant's availability.

Under Oklahoma law, prior incidents of abuse by the defendant against the deceased spouse are admissible in marital homicide cases. *Harris v. State*, 84 P.3d 731, 747 (Okla. Crim. App. 2004); *Smith v. State*, 932 P.2d 521, 530 (Okla. Crim. App. 1996). Additionally, the OCCA holds that statements of a decedent which show the decedent's state of mind toward the defendant or which supply the motive for the killing are admissible in a homicide case. *Andrew v. State*, 164 P.3d 176, 188 (Okla. Crim. App. 2007); *Welch v. State*, 2 P.3d 356, 370 (Okla. Crim. App. 2000).

As set forth above, Shelia Walker, Officer James, Penny Howell, Gerald McDaniel and Tonya Schooley testified that Ms. Meek told them Petitioner had physically abused her. Tonya Schooley and Gerald McDaniel also testified they saw injuries on Ms. Meek which she said were caused by Petitioner. Beverly Abbott testified that Ms. Meek asked her about two days before her disappearance if Ms. Abbot had seen Petitioner talking to anyone in a white car while Ms. Abbott was working at the E-Z Mart.

Petitioner denied he ever physically abused Ms. Meek. (Tr. 1096-99). Instead, he

testified that Ms. Meek physically abused him. (Tr. 1094-96). Petitioner also denied ever having an affair with Marguerite Hart or another woman during his marriage to Ms. Meek. (Tr. 1033). Petitioner's defense was that Ms. Meek simply walked out one day and never came back. Further, she did not care enough for her children not to leave, and Petitioner did nothing to make her want to leave. (Tr. 711).

Ms. Meek's statements as testified to by these witnesses were non-testimonial because they were not made during custodial interrogation, in affidavits, as prior testimony not subject to cross examination by Petitioner, or statements which the declarant would reasonably expect to be used prosecutorially as addressed in *Crawford*. In fact, Ms. Meek told Officer James she did not want to pursue charges against Petitioner when she reported Petitioner's abuse of her to him. Therefore, the admission of these witnesses' statements did not violate the Confrontation Clause. Given Petitioner's testimony in support of his defense, the evidence that Ms. Meek told people Petitioner beat her was admissible to show her state of mind toward Petitioner. It also was probative of Petitioner's motive to kill his wife--he wanted to be rid of her. Similarly, the testimony of Ms. Abbott about Ms. Meek's inquiries regarding Petitioner's interaction with a woman in a white car was probative of Ms. Meek's state of mind toward Petitioner and also of his motive to kill Ms. Meek.

Vickie Bell, a DHS employee, testified she interviewed J.K. shortly after Ms. Meek disappeared. J.K. told her that Petitioner and Ms. Meek were fighting in their bedroom, and she heard the "F-word." Then Ms. Meek got quiet. Ms. Bell further testified J.K. told her

that after the fight, Petitioner had J.K. and her brother help him cut out a section of carpet, roll it up, and put it in the trunk of their red car. (Tr. 480-81). J.K. told Ms. Bell she thought they dumped the carpet at Hochatown, and they stayed in a tent for a while. They next went to their grandparents' house, and Petitioner then took them home. (Tr. 481). J.K. also said Petitioner told her that Ms. Meek was gone forever. (Tr. 482).

The admission of this testimony and Ms. Walker's testimony about J.K.'s statements to her when J.K. was ten years old was the subject of a pretrial hearing on October 18, 2013. (Tr. 10/18/13 39-62) (Dkt. 11-8). The trial court ruled Ms. Bell's and Ms. Walker's testimony was admissible pursuant to Okla. Stat. tit. 12, § 2804, and stated all the circumstances supporting the determination of the admissibility of J.K.'s statements to Ms. Bell. Specifically, the trial court found J.K. was unavailable based upon the above statute, *i.e.*, that she had no memory of ever making the statements; that she testified at the preliminary hearing and the defense did not cross-examine her; that the subject statements testified to by Ms. Bell did not violate the tenets of *Crawford*; that part of the statement was corroborated by other evidence in the case; that J.K. repeated her statements to other witnesses; that J.K. appeared able to communicate; that there was no relationship between Ms. Bell and J.K.; that J.K.'s interview with Ms. Bell occurred close in time to Ms. Meek's disappearance; that J.K. had no motive to fabricate her statements; and that J.K. had been in the continuous custody of Petitioner since 2002. (Tr. 10/18/13 61-62).

Based upon this record, the OCCA found trial counsel was not ineffective for failing

to object to the above testimony. The OCCA applied *Strickland* and determined that trial counsel's failure to object was based upon "a type of trial strategy showing the victim tried to blame Meek for their troubled marriage and finally left; therefore, counsel's conduct did not constitute ineffective assistance." *Meek*, slip op. at 5.

As fully addressed herein, Petitioner's defense was that Ms. Meek could not tolerate married life with him and their children any longer, and she simply walked out on them. Testimony showing her complaints about Petitioner's behavior toward her arguably supported this defense. The fact that this strategy was unsuccessful does not equate to ineffective assistance of counsel, given the "double-edged sword" nature of the evidence. *Cf. Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009) (no ineffective assistance where counsel strategically chose not to put on evidence of the defendant's chronic substance abuse; this "double-edged sword" evidence was just as likely to produce a negative reaction in the jury as it was to produce one which would inspire the jury to mitigate the defendant's punishment).

Given this record, the Court finds the OCCA's decision on this claim was not contrary to, or an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the evidence presented at trial. This ground for habeas relief is meritless.

### C. Evidentiary Harpoon

`      Petitioner alleges counsel was ineffective in failing to object to what he characterizes

as an evidentiary harpoon by OSBI Agent Fielding. The OCCA has clearly defined the six characteristics of evidentiary harpoons:

> (1) they are generally made by experienced police officers, (2) they are voluntary statements; (3) they are wilfully jabbed rather than inadvertent; (4) they inject information concerning other crimes; (5) they are calculated to prejudice the defendant; and (6) they are prejudicial to the rights of the defendant on trial.

*Scott v. State*, 808 P.2d 73, 76 (Okla. Crim. App. 1991) (quoting *Pierce v. State*, 786 P.2d 1255, 1260 (Okla. Crim. 1990); *Bruner v. State*, 612 P.2d 1375, 1378 (Okla. Crim. 1980)).

Petitioner raised this claim on direct appeal as an ineffective assistance of counsel claim, as well as an underlying substantive claim. He argued the trial court erred in admitting the portion of Agent Fielding's testimony regarding his interview with Petitioner. The record shows that Agent Fielding's testimony at issue was given in response to the prosecutor's direct question:

> Q.   And at some point what stopped the interview I guess? At some point was it just over or what happened?
>
> A.   Well, I mean at the end of the interview I had confronted Jerry that I believed there was more to the story or that he wasn't being truthful or confronted him that he might be involved in Hope's disappearance. He told me he didn't want to talk to me anymore and requested an attorney, and that was pretty much my extent of talking to Mr. Meek.

(Tr. 556).

The OCCA denied the substantive claim as follows:

> . . . [W]e find that the agent's answer given in direct questioning by the prosecutor was not met with contemporaneous objection, thus any error is waived. Okla. Stat. tit. 21, § 2104 (2011). We further find no plain error as

the answer did not meet the definition of an evidentiary harpoon, nor did the question rise to the level of prosecutorial misconduct. *See Scott v. State*, 808 P.2d 73, 76 (Okla. Crim. App. 1991) (defining an evidentiary harpoon); *see also Garrison v. State*, 103 P.3d 590, 612 (Okla. Crim. App. 2004) (No trial will be reversed on the allegations of prosecutorial misconduct "unless the cumulative effect was such to deprive the defendant of a fair trial.").

*Meek*, slip op. at 4-5.

In his reply brief, Meek claims that the answer was a comment on Meek's invocation of his Constitutional rights. Meek, however, cites no authority supporting his claim, and, furthermore, no new propositions may be raised in a reply brief pursuant to Rule 3.4(F), *Rules of the [Oklahoma] Court of Criminal Appeals*, Title 22, Ch. 18, App. (2015), thus the issue is waived for consideration.

*Meek*, slip op. at 5 n.4.

Petitioner relies solely on Oklahoma law regarding this claim. As set forth above, the OCCA expressly found the complained-of testimony was not an evidentiary harpoon, and it did not constitute prosecutorial error under Oklahoma law. The OCCA's interpretation of state law is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Further, this Court finds the OCCA's determination that trial counsel was not ineffective in failing to object to the testimony was not contrary to, or an unreasonable application of Supreme Court law. Thus, habeas relief is not warranted.

To the extent Petitioner is attempting to raise a claim that trial counsel was ineffective in his failure to object to a comment about his Fifth Amendment right to an attorney, this claim also fails. The OCCA found such claim was procedurally barred, because Petitioner did not raise it in his direct appeal, instead presenting it in his reply brief. *Meek*, slip op. at

5 n.4.  As set forth above, the OCCA also found counsel was not ineffective for failing to preserve this issue, "as no error occurred."  *Meek*, slip op. at 5.

While Petitioner did not clearly raise the substantive issue of improper comment upon his right to an attorney on direct appeal, he vaguely raised on direct appeal an ineffective assistance of counsel claim for failing to object to this comment, despite the OCCA's finding to the contrary.  (Dkt. 11-1 at 44).  Because the OCCA arguably did not address the claim, this Court's review will be de novo.  *See Williams v. Trammell*, 782 F.3d 1184, 1191 (10th Cir. 2015) ("We review de novo claims that the state court did not adjudicate on the merits.").

"[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin v. California*, 380 U.S. 609, 614 (1965).  This holding refers to the accused's failure to testify.  *Id.*  at 615.  The use of a criminal defendant's pre-arrest silence to impeach the defendant's credibility when the defendant testifies is not prohibited by the Fifth Amendment.  *Jenkins v. Anderson*, 447 U.S. 231, 238-39 (1980).  In *Carter v. Ward*, 347 F.3d 860, 864 (10th Cir. 2003), the Court, citing *Jenkins*, noted the Supreme Court left open the issue of whether pre-arrest silence may be used by the prosecution to establish guilt, but reiterated that "the Fifth Amendment did *not* prohibit the use of pre-arrest silence for purposes of impeachment." (emphasis in original).  *See also United States v. Chimal*, 976 F.2d 608, 611 (10th Cir. 1992) ("It is well-established that a prosecutor may use a

defendant's pre-arrest silence to impeach the defendant's credibility.")

As shown above, the prosecutor did not specifically ask Agent Fielding if Petitioner said anything. Instead, he asked the agent how his conversation with Petitioner ended. Given Petitioner's defense of complete innocence of any involvement in Ms. Meek's disappearance, the agent's testimony about Petitioner's decision to contact an attorney rather than speak with the agent was proper impeachment concerning Petitioner's credibility. *See United States v. Watters*, 237 F. App'x 376, 381-82 (10th Cir. 2007) (holding there was no improper comment upon the defendant's right to an attorney where the defendant raised the defense that someone else occupied property where guns and drugs were found, and prosecutor properly asked him during his testimony about his pre-arrest actions in contacting an attorney before speaking with police).

The record shows that before his arrest, Petitioner gave investigators at least three versions of what he did immediately before Ms. Meek's disappearance. When he testified in his own behalf, his testimony generally comported with the pre-arrest statement he gave to Agent Fielding. The gist of Petitioner's testimony was that he was the backbone of his family and completely committed to the children, that Ms. Meek was selfish, that she was a bad mother, that she wanted to leave him and the children, and that he had nothing whatsoever to do with her disappearance. Therefore, Agent Fielding's testimony that Petitioner thought he needed an attorney before speaking further with law enforcement impeached his testimony that he was completely innocent in his wife's disappearance, and

Fielding's testimony did not violate Petitioner's Fifth Amendment rights. Because the underlying claim is meritless, counsel could not have been ineffective for failing to object to the testimony. This claims for habeas corpus relief also fails.

**Ground III: Cumulative Error**

In Petitioner's final ground for relief, Petitioner alleges the cumulative effect of errors deprived him of a fundamentally fair trial. The OCCA denied relief on this claim, stating: "Finally, . . . we find that there are no individual errors requiring relief. As we find no error that was harmful to Meek, there is no accumulation of error to consider." *Meek*, slip op. at 5 (citing *Barnett v. State*, 263 P.3d 959, 970 (Okla. Crim. App. 2011)).

"[T]he Supreme Court has never recognized the concept of cumulative error" *Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019). Nonetheless, "[c]umulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.), *cert. denied*, 522 U.S. 844 (1997) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990)). *See also Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002), *cert. denied*, 540 U.S. 833 (2003) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated.").

Here, the OCCA and this Court found no errors in Grounds I, II, or III of the petition. This Court, therefore, concludes Petitioner cannot establish there was cumulative error, or

that the OCCA's decision was contrary to Supreme Court law.  Therefore, habeas relief cannot be granted on this claim.

**Request for Evidentiary Hearing**

At the end of his brief in support of the petition, Petitioner requests an evidentiary hearing "as to the Petition as a whole and in particular as to any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the State."  (Dkt. 9 at 52).  "[W]hen the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing." *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (citation and internal quotation marks omitted).  Further, "Petitioner is not entitled to an evidentiary hearing on meritless claims." *Cleveland v. Sharp*, 672 F. App'x 824, 826 (10th Cir. 2016).  Because this Court found no merit in any of Petitioner's claims, an evidentiary hearing cannot be granted.

**Certificate of Appealability**

The Court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2).  In addition, he has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Therefore, Petitioner should be denied a certificate of appealability.

**ACCORDINGLY**, Petitioner's petition for a writ of habeas corpus (Dkt. 2) is DENIED, and Petitioner is denied a certificate of appealability.

**IT IS SO ORDERED** this 31st day of March 2020.

Ronald A. White
United States District Judge
Eastern District of Oklahoma